UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

*FILED*
*2005 NOV 21 PM 4: 15*
*CLERK*
*WESTERN DISTRICT COURT*
*OF TEXAS*
*BY _____*

| | | |
|---|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF TEXAS, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CAUSE NO. **A05CA976 LY** |
| PUTNAM, LLC d/b/a/ PUTNAM INVESTMENTS, PUTNAM INVESTMENT MANAGEMENT, LLC, and THE PUTNAM ADVISORY COMPANY, LLC, | § § § § § | |
| Defendants. | § § | |

## NOTICE OF REMOVAL

Putnam, LLC ("Putnam"), Putnam Investment Management, LLC, ("PIM"), and The Putnam Advisory Company, LLC ("PAC") (collectively "Defendants") file this Notice of Removal pursuant to 28 U.S.C § 1446(a) and respectfully submit as follows:

### I.    STATE COURT ACTION

Putnam, LLC ("Putnam"), Putnam Investment Management, LLC, ("PIM"), and The Putnam Advisory Company, LLC ("PAC") are the defendants in a civil action commenced on or about October 17, 2005, in the 200th Judicial District Court of Travis County, Texas, and styled *Employees Retirement System of Texas v. Putnam, LLC, d/b/a Putnam Investments, Putnam Investment Management, LLC, and The Putnam Advisory Company, LLC*, Cause No. GN503755 (the "State Court Action"). Defendants filed an Original Answer (the "Answer") on November 21, 2005.

True and correct copies of the State Court Action docket sheet, the citations, the Petition, and the Answer are attached hereto as Exhibits 1, 2, 3, and 4, respectively. Exhibits 2-4 constitute all process, pleading, and orders served in the State Court Action.

All Defendants were served with citation in the State Court Action through the Office of the Texas Secretary of State on October 28, 2005.  This Notice of Removal is filed within 30 days of service and is timely filed under 28 U.S.C. § 1446(b).

## II.   JURISDICTION AND VENUE

### A.  There is Complete Diversity of Citizenship of the Parties.

Pursuant to 28 U.S.C. §§ 1332 and 1441, the federal district courts have original jurisdiction over this action based on diversity of citizenship among the parties in that each and every defendant is now, and was at the time the action was commenced, diverse in citizenship from the plaintiff.  The defendants are not, and were not at the time the suit was commenced, citizens of the State of Texas.

Plaintiff Employees Retirement System of Texas ("ERS") is a Texas governmental public trust fund.  Pursuant to Section 811.004 of the Texas Government Code, and as acknowledged in the Petition, ERS "has the powers, privileges, and immunities of a corporation."  ERS is an independent agency, and is not the alter ego of the state.  ERS is established and maintained under the laws of the State of Texas and has its principal place of business now, and at the time the State Court Action was commenced, in the State of Texas.  Plaintiff ERS is now and was at the time the State Court Action was commenced, a citizen of the State of Texas and of no other state.

Defendant Putnam, LLC is a corporation incorporated under the laws of the State of Delaware, having its principal place of business now, and at the time the State Court Action was commenced, in Boston in the Commonwealth of Massachusetts.   Defendant Putnam, LLC, is now, and was at the time the State Court Action was commenced, a citizen of the State of Delaware and the Commonwealth of Massachusetts and of no other state.

Defendant Putnam Investment Management, LLC is a corporation incorporated under the laws of the State of Delaware, having its principal place of business now, and at the time the State Court Action was commenced, in Boston in the Commonwealth of Massachusetts. Defendant Putnam Investment Management, LLC is now, and was at the time the State Court Action was commenced, a citizen of the State of Delaware and the Commonwealth of Massachusetts and of no other state.

Defendant The Putnam Advisory Company, LLC is a corporation incorporated under the laws of the State of Delaware, having its principal place of business now, and at the time the State Court Action was commenced, in Boston in the Commonwealth of Massachusetts. Defendant The Putnam Advisory Company, LLC is now, and was at the time the State Court Action was commenced, a citizen of the State of Delaware and the Commonwealth of Massachusetts and of no other state.

**B.  The Amount in Controversy Exceeds $75,000.**

Upon information and belief, based upon the allegations in plaintiffs' complaint, the amount in controversy in this action exceeds, exclusive of interest and costs, the sum of $75,000.

**C.  Venue in this Court is Proper.**

Removal to this judicial district and division is proper under 28 U.S.C. § 1441(a) because this district and division embrace Travis County, the place where the State Court Action is pending.

**D.  The Forum Selection Clause Does Not Prohibit Removal.**

Contrary to the allegation in Plaintiff's Petition, there is no forum selection clause currently binding upon the parties that precludes removal of the State Court Action. The contract upon which Plaintiff relies was terminated by ERS nearly two years prior to commencement of

the State Court Action.  As set forth explicitly within that contract, in a provision entitled "Survival of Terms," the sole terms of the contract that survive termination are "the indemnity and confidentiality provisions of Paragraphs IX and XVIII."  *See* ERS Contract (without exhibits), attached as Exhibit 5. As the drafter of the ERS Contract, ERS controlled the language of the contract and the provisions included therein.  By specifying that certain enumerated provisions survived termination, ERS precluded survival beyond termination of all provisions not specifically preserved.  Accordingly, there is no operative forum selection clause that would contractually prohibit the removal of the State Court Action.

### III.    NOTICE

Defendants have filed a Notice of Removal in the 200th Judicial District Court of Travis County, Texas on the same date this notice is filed.

### IV.    CONCLUSION

Removal of the State Court Action is proper under 28 U.S.C. § 1441 because it is a civil action brought in a state court, and the federal district courts have original jurisdiction pursuant to 28 U.S.C. § 1332 because the plaintiffs and defendant are diverse in citizenship and the amount in controversy, upon information and belief, exceeds $75,000.00

WHEREFORE, Putnam, LLC, Putnam Investment Management, LLC, and The Putnam Advisory Company, LLC, all the defendants in this action, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, remove this action for trial from the 200th Judicial District Court of Travis County, Texas to this Court, on this 21st day of November 2005.

Respectfully submitted,

Shannon H.  Ratliff,
State Bar No. 16573000
Lisa A. Paulson
State Bar No. 00784732
Ryan A. Botkin
State Bar No. 00793366
Ratliff Law Firm
600 Congress Street, Suite 3100
Austin, TX  78701
512-493-9600 (Telephone)
512- 493-9625 (Facsimile)


Charles W. Schwartz
State Bar No. 17861300
Noelle M. Reed
State Bar No. 24044211
Skadden, Arps, Slate, Meagher & Flom LLP
1600 Smith, Suite 4400
Houston, TX 77002
713-655-5160 (Telephone)
888-329-2286 (Facsimile)

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document, NOTICE OF REMOVAL, has been served on the following counsel via facsimile on November 21, 2005.

**Via Facsimile No.: 512-480-5616**
John J. McKetta, III
David H. Donaldson
Ron H. Moss
GRAVES, DOUGHERTY, HEARON
   & MOODY
401 Congress Avenue, Suite 2200
Austin, Texas  78767

_____
Ryan A. Botkin

Case:gn503755 with (7) documents

| Filed Date | Category | Description | Additional Info |
|---|---|---|---|
| 10/17/2005 | PET-PL | Judges Notes/Comments | |
| 10/27/2005 | OTHER | Original Petition/Application | PLAINTIFF'S ORIGINAL PETITION |
| 11/7/2005 | S | Letter | RON H. MOSS |
| 11/7/2005 | S | | |
| 11/7/2005 | S | | |
| 11/7/2005 | S | | |
| 11/21/2005 | ANS-RESP | Original Answer | PUTNAM, LLC d/b/a/ PUTNAM INVESTMENTS, PUTNAM INVESTMENT MANAGEMENT, LLC, and THE PUTNAM ADVISORY COMPANY, LLC. |

EXHIBIT

1

ALL-STATE LEGAL®



Bruce Elfant, Constable
Travis County Constable Precinct 5
1003 Guadalupe
Austin, Tx 78701
November 01, 2005

DONALDSON,DAVID H JR
501 CONGRESS AVE. SUITE# 2300
AUSTIN,TX 78701

## INVOICE

Cause Nbr      GN503755-2
Plaintiff       EMPLOYEES RETIREMENT SYSTEM OF
Service Name    PUTNAM INVESTMENT MANAGEMENT L

Service Fee        60.00
Payment Received   60.00
Balance Due         0.00

Thank you for allowing us to be of service to you in this case.

Check the status of your civil process at
Constable5.com
Be sure to bookmark the ServiceCheck page

FILED #5

2005 NOV -7 PM 2: 04

Amelia Rodriguez Mendoza
DISTRICT CLERK
TRAVIS COUNTY TEXAS



EXHIBIT
2

Cause No.: GN503755                          {}          In the  200
                                             {}          District Court
Plaintiff:                                   {}          TRAVIS County
EMPLOYEES RETIREMENT                         {}
SYSTEM OF TEXAS

Defendant:
PUTNAM LLC DOING BUSINESS
AS PUTNAM INVESTMENTS; ETAL

Officer's Return

Came to hand October 27, 2005 at 12:35 P.M. and executed in Travis County,
Texas, on October 28, 2005 at  9:24 A.M. by delivering to PUTNAM
INVESTMENT MANAGEMENT, LLC by delivering to Roger Williams, Secretary
of State of the State of Texas, at 1019 Brazos Street, Austin, Texas, 78701, by
delivering to LORENA BERNAL designated agent for service for the Secretary of
State, duplicate true copies of the citation together with accompanying duplicate
true copies of the Plaintiff's ORIGINAL petition.

FEE: $ 60 Paid

                                              Bruce Elfant,
                          Travis County Constable Precinct 5
                                      Travis County, Texas

                         by: _____
                                  Miracle Mount, Deputy

PAYED
11/4/05

Scanned on NOV 8, 2005

CITATION
THE STATE OF TEXAS

**Cause No. GN503755**

EMPLOYERS RETIREMENT SYSTEM OF TEXAS          , Plaintiff

vs.

PUTNAM, LLC DOING BUSINESS AS PUTNAM INVESTMENTS;          , Defendant
PUTNAM INVESTMENT MANAGEMENT, LLC; AND THE PUTNAM
ADVISORY COMPANY, LLC

To: PUTNAM INVESTMENT MANAGEMENT, LLC
    TO BE SERVED BY AND THROUGH,
    THE SECRETARY OF STATE OF TEXAS,
    1019 BRAZOS STREET
    AUSTIN, TEXAS 78701
Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A. M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.**

Attached is a copy of the <u>ORIGINAL PETITION</u>
of the <u>PLAINTIFF</u>          in the above styled and numbered cause, which was filed on the <u>17th day</u>
<u>of October, 2005</u>, in the <u>200TH</u> Judicial District Court of Travis County, Austin, Texas.

   ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, this the <u>27th day of October, 2005</u>.

REQUESTED BY:                                    AMALIA RODRIGUEZ-MENDOZA
DAVID H. DONALDSON                               Travis County District Clerk
401 CONGRESS AVENUE, SUITE #2200                 Travis County Courthouse
AUSTIN, TEXAS 78711                              1000 Guadalupe, P.O. Box 1748
(512) 480-5616  FAX: (512) 480-5816              Austin, Texas

                                                 By _____

                                                    ELLIE CASTRO, Deputy

- - - - - - - - - - - - - - - - - - - - - - - R E T U R N - - - - - - - - - - - - - - - - - - - - - - -

Came to hand on the ____ day of _____, _____ at ____ o'clock ___.M., and executed at _____.
within the County of _____ on the ____ day of _____, _____, at _____ o'clock ___.M., by delivering
to the within named _____
_____, each in person, a true copy of this citation together
with the accompanying pleading, having first attached such copy of such citation to such copy of pleading and endorsed
on such copy of citation the date of delivery.                  BRUCE ELFANT
Service Fee:$ _____              CONSTABLE PREC. 5 TRAVIS COUNTY, TEXAS

                                      SHERIFF/CONSTABLE/AUTHORIZED PERSON
Sworn to and subscribed before me this the        BY: _____
_____ day of _____, _____.

_____              PRINTED NAME OF SERVOR
NOTARY PUBLIC, THE STATE OF TEXAS              _____ County, Texas
Original Copy                    Constable Precinct 5        GN503755-002

```
*************** -COMM. JOURNAL- ******************* DATE NOV-04-2005 ***** TIME 13:42 ********

      MODE = MEMORY TRANSMISSION              START=NOV-04 13:40   END=NOV-04 13:42

      FILE NO.=439

  STN   COMM.   ONE-TOUCH/  STATION NAME/EMAIL ADDRESS/TELEPHONE NO.   PAGES   DURATION
  NO.           ABBR NO.

  001    OK      ☎          84805816                                  002/002  00:00:55


                                           -CONSTABLE PCT5         -

  ************************************** -CONSTABLE PCT5  - ***** -    512 854 4228- *********
```

Cause No.: GN503755          ()        In the 200
                             ()        District Court
Plaintiff:                   ()        TRAVIS County
EMPLOYEES RETIREMENT         ()
SYSTEM OF TEXAS

Defendant:
PUTNAM LLC DOING BUSINESS
AS PUTNAM INVESTMENTS; ETAL

Officer's Return

Came to hand October 27, 2005 at 12:34 P.M. and executed in Travis County, Texas, on October 28, 2005 at 9:24 A.M. by delivering to PUTNAM, LLC D/B/A PUTNAM INVESTMENTS by delivering to Roger Williams, Secretary of State of the State of Texas, at 1019 Brazos Street, Austin, Texas, 78701, by delivering to LORENA BERNAL designated agent for service for the Secretary of State, duplicate true copies of the citation together with accompanying duplicate true copies of the Plaintiff's ORIGINAL petition.

FEE. $ 60 Paid

Bruce Elfant,
Travis County Constable Precinct 5
Travis County, Texas

by:_____
Miracle Mount, Deputy



Bruce Elfant, Constable
Travis County Constable Precinct 5
1003 Guadalupe
Austin, Tx 78701
November 01, 2005

DONALDSON,DAVID H  JR
501 CONGRESS AVE. SUITE# 2300
AUSTIN,TX 78701

## INVOICE

Cause Nbr      GN503755-3
Plaintiff          EMPLOYEES RETIREMENT SYSTEM OF
Service Name   PUTNAM LLC D/B/A PUTNAM INVEST

Service Fee      60.00
Payment Received  60.00
Balance Due     0.00

Thank you for allowing us to be of service to you in this case.

Check the status of your civil process at
Constable5.com
Be sure to bookmark the Service Check page

FILED #5

2005 NOV -7  PM 2: 04

DISTRICT CLERK
TRAVIS COUNTY, TEXAS

Scanned on NOV 8, 2005

| | | |
|---|---|---|
| Cause No.: GN503755 | {} | In the 200 |
| | {} | District Court |
| Plaintiff: | {} | TRAVIS County |
| EMPLOYEES RETIREMENT | {} | |
| SYSTEM OF TEXAS | | |

Defendant:
PUTNAM LLC DOING BUSINESS
AS PUTNAM INVESTMENTS; ETAL

## Officer's Return

Came to hand October 27, 2005 at 12:34 P.M. and executed in Travis County, Texas, on October 28, 2005 at 9:24 A.M. by delivering to PUTNAM, LLC D/B/A PUTNAM INVESTMENTS by delivering to Roger Williams, Secretary of State of the State of Texas, at 1019 Brazos Street, Austin, Texas, 78701, by delivering to LORENA BERNAL designated agent for service for the Secretary of State, duplicate true copies of the citation together with accompanying duplicate true copies of the Plaintiff's ORIGINAL petition.

FEE: $ 60 Paid

                                            Bruce Elfant,
                        Travis County Constable Precinct 5
                                    Travis County, Texas

                        by:_____
                                    Miracle Mount, Deputy



C I T A T I O N
**T H E   S T A T E   O F   T E X A S**                    **Cause No. GN503755**

EMPLOYEES RETIREMENT SYSTEM OF TEXAS                    , Plaintiff

   **vs.**

PUTNAM, LLC DOING BUSINESS AS PUTNAM INVESTMENTS;        , Defendant
PUTNAM INVESTMENT MANAGEMENT, LLC; AND THE PUTNAM
ADVISORY COMPANY, LLC

To:  PUTNAM, LLC D/B/A PUTNAM INVESTMENTS
       TO BE SERVED BY AND THROUGH,
       THE SECRETARY OF STATE OF TEXAS,
       1019 BRAZOS STREET
       AUSTIN, TEXAS 78701
Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED.  You may employ an attorney.  If you or your attorney
do not file a written answer with the clerk who issued this citation by
10:00 A. M. on the Monday next following the expiration of twenty days
after you were served this citation and petition, a default judgment may
be taken against you.**

Attached is a copy of the <u>ORIGINAL PETITION</u>
of the <u>PLAINTIFF</u>          in the above styled and numbered cause, which was filed on the <u>17th day</u>
<u>of October, 2005</u>, in the <u>200TH</u> Judicial District Court of Travis County, Austin, Texas.

     ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, this the <u>27th day of October, 2005</u>.
REQUESTED BY:                                        AMALIA RODRIGUEZ-MENDOZA
DAVID H. DONALDSON                                   Travis County District Clerk
401 CONGRESS AVENUE, SUITE #2200                     Travis County Courthouse
AUSTIN, TEXAS 78711                                  1000 Guadalupe, P.O. Box 1748
(512) 480-5616  FAX: (512) 480-5816                  Austin, Texas

                                                     By
                                                        ELLIE CASTRO, Deputy

- - - - - - - - - - - - - - - - - - - -  R E T U R N  - - - - - - - - - - - - - - - - - - - - - -

Came to hand on the ____ day of _____,_____ at _____o'clock ___.M., and executed at _____,
within the County of _____on the ____ day of _____,_____,at _____o'clock ___.M., by delivering
to the within named _____
_____,each in person, a true copy of this citation together
with the accompanying pleading, having first attached such copy of such citation to such copy of pleading and endorsed
on such copy of citation the date of delivery.
Service Fee:$ _____                            **BRUCE ELFANT**
                                                     CONSTABLE PREC 5
                                                     SHERIFF/CONSTABLE/AUTHORIZED PERSON
Sworn to and subscribed before me this the           BY: _____
_____ day of _____, _____.
                                                     PRINTED NAME OF SERVOR
_____            _____ County, Texas
NOTARY PUBLIC, THE STATE OF TEXAS
Original Copy                    Constable Precinct 5                      GN503755-001

Scanned on NOV 8, 2005

************** ~COMM. JOURNAL~ ****************** DATE NOV-04-2005 ***** TIME 13:40 ********

MODE = MEMORY TRANSMISSION            START=NOV-04 13:38     END=NOV-04 13:40

FILE NO.=438

| STN NO. | COMM. | ONE-TOUCH/ABBR NO. | STATION NAME/EMAIL ADDRESS/TELEPHONE NO. | PAGES | DURATION |
|---|---|---|---|---|---|
| 001 | OK | ⓧ | 84805816 | 002/002 | 00:00:55 |

                                                    -CONSTABLE PCT5          -

************************************ ~CONSTABLE PCT5  ~ ***** ~     512 854 4228~ **********

Cause No.: GN503755                    ()        In the  200
                                       ()        District Court
Plaintiff.                             ()        TRAVIS County
EMPLOYEES RETIREMENT                   ()
SYSTEM OF TEXAS

Defendant:
PUTNAM LLC DOING BUSINESS
AS PUTNAM INVESTMENTS; ETAL

Officer's Return

Came to hand October 27, 2005 at 12:35 P.M. and executed in Travis County,
Texas, on October 28, 2005 at 9:24 A.M. by delivering to PUTNAM
INVESTMENT MANAGEMENT, LLC by delivering to Roger Williams, Secretary
of State of the State of Texas, at 1019 Brazos Street, Austin, Texas, 78701, by
delivering to LORENA BERNAL designated agent for service for the Secretary of
State, duplicate true copies of the citation together with accompanying duplicate
true copies of the Plaintiff's ORIGINAL petition.

FEE. $ 60 Paid

                                              Bruce Elfant,
                            Travis County Constable Precinct 5
                                    Travis County, Texas

                        by:_____
                                    Miracle Mount, Deputy



Bruce Elfant, Constable
Travis County Constable Precinct 5
1003 Guadalupe
Austin, Tx 78701
November 01, 2005

DONALDSON,DAVID H JR
501 CONGRESS AVE. SUITE# 2300
AUSTIN,TX 78701

## INVOICE

Cause Nbr        GN503755-1
Plaintiff        EMPLOYEES RETIREMENT SYSTEM OF
Service Name     THE PUTNAM ADVISORY COMPANY LL

Service Fee       60.00
Payment Received  60.00
Balance Due        0.00

Thank you for allowing us to be of service to you in this case.

Check the status of your civil process at
Constable5.com
Be sure to bookmark the ServiceCheck page

FILED #5

2005 NOV -7 PM 2: 04

_Umnam Rodrigo Izendez_
DISTRICT CLERK
TRAVIS COUNTY TEXAS

```
*************** -COMM. JOURNAL- ******************* DATE NOV-04-2005 ***** TIME 13:37 ********

     MODE = MEMORY TRANSMISSION              START=NOV-04 13:34    END=NOV-04 13:37

     FILE NO.=435

  STN   COMM.   ONE-TOUCH/   STATION NAME/EMAIL ADDRESS/TELEPHONE NO.    PAGES    DURATION
  NO.           ABBR NO.

  001   OK      ☎            84805816                                    002/002  00:00:52


                                                      -CONSTABLE PCT5           -

********************************* -CONSTABLE PCT5  - ***** -    512 854 4228- *********
```

Cause No.: GN503755     ()    In the 200
      ()    District Court
Plaintiff:       ()    TRAVIS County
EMPLOYEES RETIREMENT   ()
SYSTEM OF TEXAS

Defendant:
PUTNAM LLC DOING BUSINESS
AS PUTNAM INVESTMENTS; ETAL

### Officer's Return

Came to hand October 27, 2005 at 12:35 P.M. and executed in Travis County, Texas, on October 28, 2005 at 9:24 A.M. by delivering to THE PUTNAM ADVISORY COMPANY, LLC by delivering to Roger Williams, Secretary of State of the State of Texas, at 1019 Brazos Street, Austin, Texas, 78701, by delivering to LORENA BERNAL designated agent for service for the Secretary of State, duplicate true copies of the citation together with accompanying duplicate true copies of the Plaintiff's ORIGINAL petition.

FEE: $ 60 Paid

Bruce Elfant,
Travis County Constable Precinct 5
Travis County, Texas

by:_____
Miracle Mount, Deputy

Cause No.: GN503755      {}         In the  200
                                  {}         District Court

Plaintiff:                      {}         TRAVIS County
EMPLOYEES RETIREMENT     {}
SYSTEM OF TEXAS

Defendant:
PUTNAM LLC DOING BUSINESS
AS PUTNAM INVESTMENTS; ETAL

### Officer's Return

Came to hand October 27, 2005 at 12:35 P.M. and executed in Travis County, Texas, on October 28, 2005 at  9:24 A.M. by delivering to THE PUTNAM ADVISORY COMPANY, LLC by delivering to Roger Williams, Secretary of State of the State of Texas, at 1019 Brazos Street, Austin, Texas, 78701, by delivering to LORENA BERNAL designated agent for service for the Secretary of State, duplicate true copies of the citation together with accompanying duplicate true copies of the Plaintiff's ORIGINAL petition.

FEE: $ 60 Paid

Bruce Elfant,
Travis County Constable Precinct 5
Travis County, Texas

by:_____
Miracle Mount, Deputy

C I T A T I O N

T H E   S T A T E   O F   T E X A S

**Cause No. GN503755**

EMPLOYEES RETIREMENT SYSTEM OF TEXAS                    , Plaintiff

    vs.

PUTNAM, LLC DOING BUSINESS AS PUTNAM INVESTMENTS;          , Defendant

PUTNAM INVESTMENT MANAGEMENT, LLC; AND THE PUTNAM

ADVISORY COMPANY, LLC

To:   THE PUTNAM ADVISORY COMPANY, LLC

    TO BE SERVED BY AND THROUGH,

    THE SECRETARY OF STATE OF TEXAS,

    1019 BRAZOS STREET

    AUSTIN, TEXAS 78701

Defendant, in the above styled and numbered cause:

**YOU HAVE BEEN SUED.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A. M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.**

Attached is a copy of the __ORIGINAL PETITION__ _____

of the __PLAINTIFF__ _____ in the above styled and numbered cause, which was filed on the __17th day__

__of October, 2005__, in the __200TH__ Judicial District Court of Travis County, Austin, Texas.

    ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, this the __27th day of October, 2005__.

REQUESTED BY:                                      AMALIA RODRIGUEZ-MENDOZA

DAVID H. DONALDSON                                 Travis County District Clerk

401 CONGRESS AVENUE, SUITE #2200                   Travis County Courthouse

AUSTIN, TEXAS 78711                                1000 Guadalupe, P.O. Box 1748

(512) 480-5616  FAX: (512) 480-5816                Austin, Texas

    By _____

    ELLIE CASTRO, Deputy

- - - - - - - - - - - - - - - - - -   R E T U R N   - - - - - - - - - - - - - - - - - - - -

Came to hand on the ____ day of _____,_____ at _____o'clock ___.M., and executed at _____,

within the County of _____on the ____ day of _____,_____,at _____o'clock ___.M., by delivering

to the within named _____

_____,each in person, a true copy of this citation together

with the accompanying pleading, having first attached such copy of such citation to such copy of pleading and endorsed

on such copy of citation the date of delivery.                     BRUCE ELFANT

Service Fee:$ _____                  CONSTABLE PREC. 5 TRAVIS COUNTY, TEXAS

    SHERIFF/CONSTABLE/AUTHORIZED PERSON

Sworn to and subscribed before me this the       BY :_____

_____ day of _____, _____ .       _____

    PRINTED NAME OF SERVOR

_____       _____ County, Texas

NOTARY PUBLIC, THE STATE OF TEXAS

Original Copy                 Constable Precinct 5                 GN503755-003

**GN503755**

**COURT**

CAUSE NO. _____

| | | |
|---|---|---|
| EMPLOYEES RETIREMENT | § | IN THE DISTRICT COURT OF |
| SYSTEM OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| PUTNAM, LLC d/b/a PUTNAM | § | |
| INVESTMENTS, PUTNAM | § | |
| INVESTMENT MANAGEMENT, | § | |
| LLC, AND THE PUTNAM | § | |
| ADVISORY COMPANY, LLC, | § | |
| | § | |
| Defendants. | § | 200th DISTRICT COURT |

## PLAINTIFF'S ORIGINAL PETITION

The Employees Retirement System of Texas ("ERS") brings this action against Defendants Putnam, LLC, d/b/a Putnam Investments ("Putnam"), Putnam Investment Management, LLC ("PIM") and Putnam Advisory Company, LLC ("PAC"), and for cause of action would show as follows:

### DISCOVERY LEVEL

1.      Pursuant to Texas Rule of Civil Procedure 190.3, Plaintiff ERS intends that discovery be conducted under Level 3, because the claims set forth herein justify a discovery control plan tailored to the circumstances of this specific suit.

### PARTIES

2.      Plaintiff ERS is a Texas governmental public trust fund created pursuant to article XVI, section 67 of the Texas Constitution. Under section 811.004 of the Texas Government Code, ERS has the powers, privileges and immunities of a corporation, including the right to sue in contract and tort.


**EXHIBIT**
**3**

Scanned on OCT 17, 2005

3.    Defendant Putnam, formerly known as Putnam Investments, LLC, is a foreign corporation organized and existing under the laws of the State of Delaware. Putnam, whose home office address is located at One Post Office Square in Boston, Massachusetts, may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701. The Texas Secretary of State is the agent for service on Putnam because Putnam does not maintain a regular place of business in Texas and has not designated a resident agent for service of process in Texas, although Putnam engages in or has engaged in business in Texas. This lawsuit arises out of Putnam's business dealings in Texas.

4.    Defendant PIM, formerly known as Putnam Investment Management, Inc., is a foreign corporation organized and existing under the laws of the State of Delaware. PIM, whose home office address is located at One Post Office Square in Boston, Massachusetts, may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701. The Texas Secretary of State is the agent for service on PIM because PIM does not maintain a regular place of business in Texas and has not designated a resident agent for service of process in Texas, although PIM engages in or has engaged in business in Texas.

5.    Defendant PAC is a foreign corporation organized and existing under the laws of the State of Delaware. PAC, whose home office address is located at One Post Office Square in Boston, Massachusetts, may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701. The Texas Secretary of State is the agent for service on PAC because PAC does not maintain a regular place of business in Texas and has not designated a resident agent for service of process in

2

Texas, although PAC engages in or has engaged in business in Texas. This lawsuit arises out of PAC's business dealings in Texas.

JURISDICTION AND VENUE

6. This Court has jurisdiction over defendant Putnam pursuant to section 17.042 of the Texas Civil Practice and Remedies Code because Putnam committed the torts and violations of statute that are the subject of this lawsuit in whole or in part in the State of Texas. Jurisdiction is also proper because Putnam has purposefully availed itself of the privileges and benefits of conducting business in Texas.

7. This Court has jurisdiction over defendant PIM pursuant to section 17.042 of the Texas Civil Practice and Remedies Code because PIM committed the torts and violations of statute that are the subject of this lawsuit in whole or in part in the State of Texas. Jurisdiction is also proper because PIM has purposefully availed itself of the privileges and benefits of conducting business in Texas.

8. This Court has jurisdiction over defendant PAC pursuant to section 17.042 of the Texas Civil Practice and Remedies Code because PAC entered into a contract to be performed in whole or in part in the State of Texas. Jurisdiction is also proper because PAC committed the torts and violations of statute that are the subject of this lawsuit in whole or in part in the State of Texas, and because PAC agreed that jurisdiction and venue of any action in connection with the contract would be "in Texas State District Court in Travis County, Texas."

9. Based on the foregoing contractual covenant by PAC, it would be a breach of contract and also would be in bad faith if PAC were to participate in any effort to remove this cause to federal court or request a transfer of venue to another state court

3

Scanned on OCT 17, 2005

outside of Travis County, Texas.  ERS does not plead or rely upon any federal cause of action as a basis for any of the relief sought in this cause.

10.     Pursuant to section 15.020 of the Texas Civil Practice and Remedies Code, venue is proper in Travis County, Texas, in accordance with the terms of a December 1, 2002 contract between ERS and PAC.  Venue is also proper in Travis County because all or a substantial part of the acts or omissions that are the subject of this lawsuit occurred in Travis County.

AGENCY AND RESPONDEAT SUPERIOR

11.     Defendants are liable for the conduct described below, including all conduct performed by their officers and employees and their other agents and representatives.

FACTUAL BACKGROUND

12.     Article XVI, section 67 of the Texas Constitution requires ERS to provide retirement and disability benefits for officers and employees of the state.  Those benefits are funded by trust funds composed of contributions from state employees' wages, contributions from the state and the return on investments of those contributions.  Tex. Const. art. XVI, § 67(b)(3).  Through its Board of Trustees ("Board"), ERS "must invest the funds of the system in such securities as the board may consider prudent investments." *Id.* § 67(a)(3).

13.     Section 815.301(c) of the Government Code authorizes the Board to contract with private professional investment managers to assist the Board in investing the assets of the retirement system.  Prior to 2001, ERS contracted with various private

4

Scanned on OCT 17, 2005

professional investment advisors to assist with ERS' investment decisions, including decisions related to international investment funds.

14.    In 2001, ERS decided to explore the possibility of retaining one or more new advisors to assist with international investment funds. Accordingly, on January 29, 2001, ERS invited qualified firms to submit bids to become ERS' advisor with respect to international investments. As part of the bid package, the bidders were required to respond to an ERS International Equity Advisor Questionnaire ("Questionnaire"). A number of investment firms responded to the Questionnaire, including Putnam, Templeton/FTI Institutional ("Templeton") and DuPont Capital Management Corporation ("DuPont").

15.    Putnam submitted its response to the Questionnaire on March 2, 2001. Although the responding firm was "Putnam Investments," the d/b/a of Putnam, LLC, Putnam also provided certain answers on behalf of its affiliates, PAC and PIM. In addition, Putnam identified its "key investment personnel" as including Omid Kamshad and Justin Scott, both of whom were Managing Directors of all three companies – Putnam, PAC and PIM. Putnam also noted in Tab C of the response that investment management was provided by four wholly-owned subsidiaries, two of which were PAC and PIM.

16.    In answer to the Questionnaire, Putnam made a number of representations regarding its organization, personnel and investment philosophy, among other things. For example, Putnam stated that it was not currently "out of compliance with the SEC, DOL or any other regulatory agency." Putnam also stated that Kamshad was a Chartered Financial Analyst ("CFA"), which indicated that he complied with the Association for

5

Scanned on OCT 17, 2005

Investment Management Research's ("AIMR") Code of Ethics and Standards of Professional Conduct.

17.    ERS did not retain Putnam, PAC or PIM as its investment advisor in 2001. In 2002, however, ERS decided to reassess the need for a new advisor for its international portfolio.  After evaluating the responses to the January 2001 Questionnaire, the ERS investment staff invited a number of candidates, including Putnam, to make presentations outlining their qualifications to advise ERS on international investments.  At a meeting with ERS staff on September 17, 2002, Putnam touted itself in writing as having a 60-year tradition of integrity, and promoted itself as being stable and responsive to client needs.

18.    Based on representations in the Questionnaire response and in the September 17 meeting, the ERS staff invited four finalists to make formal presentations to the Board and the ERS' Investment Advisory Committee ("IAC").  The four finalists were Putnam, Templeton, DuPont and MFS Institutional Advisors ("MFS").  MFS was subsequently eliminated from consideration because of contractual and trading issues, leaving Putnam, Templeton and DuPont as the remaining finalists.  After those finalists made presentations to the IAC and the Board on November 19, 2002, the IAC recommended that the Board allocate responsibility to Putnam for advising the Board as to 40% of the international portfolio.  Templeton was recommended as advisor for another 40% of the international portfolio, and DuPont was recommended as advisor for 20% of the portfolio.  The Board agreed with the IAC recommendation and voted to allocate advisory responsibility in those ratios.

Scanned on OCT 17, 2005

19.    In December 2002, ERS and PAC signed a three-year contract effective December 1, 2002 (the "Contract"). The recital portion of the Contract stated that ERS had accepted Defendants' proposal in reliance on their response to the Questionnaire, and that the response was expressly incorporated in the Contract "for all purposes as if restated in full." The recital also stated that ERS had accepted Defendants' proposal in reliance on their "material statements and representations." In paragraph XIII of the Contract, PAC expressly agreed that the response to the Questionnaire was true and correct, and that ERS had relied on Defendants' statements and representations when it entered into the Contract. PAC also agreed to notify ERS immediately "in the event such warranties, representations and/or statements are no longer true and correct." Contract ¶ XIII. Thus, it was clear that Defendants' representations in the Questionnaire and in the face-to-face meetings with ERS, the IAC and Board played a vital role in ERS' selection of Putnam and its affiliates to advise ERS with respect to international investments.

20.    In addition to the duty to notify ERS if any warranties or representations in the Questionnaire response were no longer true, PAC undertook numerous other affirmative duties in the Contract, including the following:

- The duty to comply with all applicable state and federal laws and regulations. Contract ¶ X.

- The duty to maintain regulatory compliance with the Securities and Exchange Commission, Department of Labor, and any other applicable regulatory agency. *Id.*

Scanned on OCT 17, 2005

- The duty to notify ERS of any violations or investigations into potential violations alleged to be committed by Defendants by any regulatory agency or any other person or entity. *Id.*

- The duty to provide investment advice in compliance with applicable laws and ERS' investment policy. Contract ¶ I.

- The duty to provide advice and training to ERS's staff on an as-needed basis. Contract ¶ V(c)-(d).

- The duty to attend IAC and Board meetings as required by the Executive Director and to consult with ERS staff on request. *Id.* ¶ V(f).

Defendants also agreed "to undertake the services under this Contract in utmost good faith, loyalty, candor, skill and due diligence." Contract ¶ XII.

21.     The fee set forth in the Contract was $2,950,000 for the first year of the contract, with payment to be made in equal quarterly installments. By the time ERS terminated the Contract in November 2003, it had paid Defendants $1,500,000 of the $2,950,000.

22.     In late October 2003, ERS learned for the first time that PIM and two of the key investment advisors who were managing directors of PAC and assigned by Defendants to ERS, Omid Kamshad and Justin Scott, were under investigation by the SEC and the State of Massachusetts for fraud and violations of securities laws. On October 28, 2003, both the SEC and Massachusetts officials filed administrative complaints accusing PIM, Kamshad and Scott of illegal activities. In particular, Kamshad and Scott were accused of engaging in "market-timing" in funds over which they had managerial responsibility for their personal benefit and to the detriment of

8

Putnam's long-term investors. PIM was accused of turning a blind eye toward Kamshad's and Scott's illegal conduct and of failing to halt market-timing activity by other Putnam clients.

23.     Market-timing is generally defined as rapid trading in and out of mutual funds in order to capture the difference between the price of the mutual fund itself and the value of the underlying securities that comprise the mutual fund. The differential occurs because most mutual funds calculate the net asset value ("NAV") (i.e., the per-share value) of their assets at 4 p.m. Eastern time each day, and all trades executed that day are based on that NAV. But international markets generally close many hours before the NAV is determined, and events occurring after those markets close often have predictable effects on the shares of companies within mutual fund portfolios. A market timer can engage in "time zone arbitrage" by purchasing mutual fund shares that reflect the stale information, and then selling a day or two later when the newly available information is reflected in a higher mutual fund share price.

24.     Market timing creates conflicts of interest between the market timers and long-term investors. First, market timing skims the short-term profits and avoids losses for the market timers; conversely, it reduces profits and deepens losses for long-term investors. Second, market timing requires the mutual fund to hoard cash reserves or sell securities to pay for the redeemed shares, thereby reducing the fund's net assets available for investment. Third, market timing results in increased transaction costs, which are typically borne by the fund and long-term investors. For these reasons, mutual fund companies generally monitor excessive trading and revoke the trading privileges of persons found to be engaged in market timing.

9

25.     Defendants represented to the public that they did not condone market timing, and that they would take steps to discourage or prevent such actions. Nevertheless, documents that came to light as a result of the SEC and Massachusetts proceedings revealed that Defendants' officers, including the chief executive officer, the chief investment officer and the general counsel, had known since 2000 or earlier that Kamshad and Scott were engaging in illegal and unethical trading practices, but Defendants had failed to stop those practices. In fact, it appears that Kamshad continued market timing trades through at least March 2003, significantly after the time he commenced advising ERS on international investments. The documents also revealed that Defendants had tolerated market timing trades by some of their customers, in violation of federal securities laws. Contrary to the representations and warranties in the Questionnaire and the Contract, Defendants never disclosed the illegal activities to ERS, nor did they disclose that the investigations were underway until the news of those investigations appeared in the media. Further, Defendants apparently terminated Scott's and Kamshad's employment on or before October 27, 2003, but Defendants failed to communicate that fact to ERS, as they were required to do by the Contract.

26.     Because of Defendants' numerous violations of law and the Contract, ERS sent notice terminating the Contract on November 12, 2003. The next day, PIM agreed to a censure and a cease-and-desist order from the SEC, and Defendants ultimately agreed to pay a total of approximately $110 million in fines and restitution to settle the charges by the SEC and Massachusetts.

CAUSES OF ACTION

A.    **Violations of the Texas Deceptive Trade Practices Act**

27.    Plaintiff ERS repeats and re-alleges each and every allegation set forth in paragraphs 12-26.

28.    In seeking and obtaining investment advice from Defendants, ERS was a subdivision or agency of the state that sought or acquired goods or services by purchase or lease.  Accordingly, ERS is a "consumer" as that term is defined in section 17.45 of the Texas Deceptive Trade Practices Act ("DTPA").  Tex. Bus. & Com. Code Ann. § 17.45(4) (Vernon 2002).

29.    Under section 17.46 of the DTPA, it is unlawful to (a) represent that goods or services have characteristics or benefits that they do not have; (b) represent that goods or services are of a particular standard, quality or grade if they are not; and (c) fail to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

30.    ERS brings suit under section 17.50 of the DTPA to recover economic damages, additional damages and attorney's fees caused by Defendants' violations of the DTPA.  The misrepresentations and failures to disclose that violate the DTPA relate to the acts summarized in the November 13, 2003 SEC Order censuring PIM:

> 7.    Between 1998 and 2003, Justin M. Scott, managing director and chief investment officer of the International Equities Group, and Omid Kamshad, managing director and chief investment officer of the International Core Equity Group, engaged in repeated short-term trading in their personal accounts of mutual funds over which they had investment decision-making responsibility and about which they had access to non-

11

public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders.

. . . .

9.     Until 2000, these employees' short-term trading went unchecked by Putnam altogether, which had minimal controls in place to detect and deter such trading.   Even after Putnam imposed some controls on employee trading in 2001, Kamshad continued to make short-term exchanges without being warned, let alone stopped, by Putnam.

10.     Putnam has known since at least 2000 that certain of its investment professionals were engaging in short-term trading of Putnam funds in their personal accounts. Yet, until on or about October 24, 2003, Putnam failed to disclose these potentially self-dealing transactions to fund boards and to fund shareholders.

. . . .

12.     Kamshad was chief investment officer for international equity at Putnam since early 2002.   During the relevant time period, he was a portfolio manager for at least seven mutual funds whose portfolios contained international securities.  By virtue of his position at Putnam, Kamshad had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders.

13.     Between 1998 and 2003, Kamshad engaged in at least 38 "round trip" trades of Putnam funds, including at least four funds he participated in managing.   In these "round trip" trades, Kamshad sold shares an average of only 13 trading days after purchasing shares in a fund and often sold shares only three or fewer trading days after purchases. As a result of his short-term trading, Kamshad realized hundreds of thousands of dollars in gains.   Kamshad typically traded hundreds of thousands of dollars worth of fund shares, and on at least one occasion, the value of his short-term trade exceeded $1 million.

14.     In January 2000, senior Putnam executives learned of "large and frequent movement" of Putnam funds by Kamshad, who at the time served as lead portfolio manager of Putnam's International Equity and Europe Equity funds.   At that time, Kamshad's trading came to the attention of senior managers in Putnam's retirement plan group. On January 25, 2000, the director of Putnam's employee relations and staffing unit discussed with Kamshad his frequent trading, and Kamshad said he would cease that

type and level of activity. On February 18, 2000, the director issued a memorandum to the file confirming this conversation.

15.     Following this discussion, Kamshad continued to engage in short-term trading in Putnam funds. Between February and April 2000, Kamshad made at least nine more round trip trades.

16.     Subsequently, in mid-2000, a senior executive at Putnam held a meeting with investment professionals in which he stated that Putnam employees must not engage in short-term trading in Putnam funds and told them that their trading must be beyond reproach. Kamshad, like other Putnam portfolio managers, attended this meeting.

17.     Despite the admonitions at that meeting, Kamshad again continued to engage in short-term trading. Between August 2000 and September 2000, he made seven more round trip trades. As recently as March 2003, Kamshad purchased more than $850,000 worth of shares in Europe Equity, a fund on which he was the lead manager. Four trading days later, he sold Europe Equity shares, garnering a profit of more than $79,000. In total, Kamshad engaged in at least 20 short-term trades after he was warned about his conduct.

18.     Scott was chief investment officer of the international equities group at Putnam. During the relevant time period, he was a portfolio manager for at least five mutual funds whose portfolios contained international securities. By virtue of his position at Putnam, Scott had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders.

19.     Between 1998 and 2000, he engaged in approximately 35 round trip trades in Putnam funds, including funds he participated in managing. In 2000 alone, Scott engaged in at least 12 trades in which he bought and sold mutual fund shares on consecutive days. As a result of his short-term trading, Scott realized hundreds of thousands of dollars in gains. Scott often traded millions of dollars worth of mutual funds.

20.     On February 18, 2000, Scott, a superior to Kamshad, was copied on a memorandum regarding Kamshad's short-term trading. The memorandum, which addresses the warning given to Kamshad in January 2000, makes clear that short-term trading in large amounts was "inconsistent with our tolerances for standard mutual fund clients." Indeed, as of March 2000, Putnam's Intranet advised employees, among other things, that "[e]xcessive exchanges by a relatively small number of individuals among a number of Putnam's funds have had a detrimental effect on the long-term shareholders of those funds."

21.    Nonetheless, Scott continued to engage in short-term trades. Between March and May of 2000, Scott made more than 20 round trip trades, including 10 "next day" round trip trades in Putnam funds.

. . . .

25.    Until 2000, however, there were minimal controls against short-term trading by Putnam's own employees in their Putnam retirement or compensation plans. In particular, there were little or no direct controls dedicated to preventing market timing by investment professionals in funds over which they had management responsibility. Even after 2000, Putnam's system for detecting and preventing market timing by its employees was fundamentally flawed because it only monitored for market timing during one quarter of a given year, leaving more than nine months of every calendar year without any monitoring whatsoever.

26.    In early 2000, Kamshad's trading came to the attention of the market timing police, who then relayed it to the Putnam group that oversees Putnam's own retirement and compensation plans. Until October 2003, however, no disciplinary action was taken against any employee for engaging in market timing or other short-term trading. Until October 2003, Putnam and its portfolio managers did not inform fund boards or fund shareholders of the improper employee trading.

. . . .

30.    In April 2002 – two years after first learning of market timing by investment professionals in funds they helped manage – Putnam amended its Code of Ethics to include a prohibition on employee market timing of Putnam funds. At no time, even after amending its Code of Ethics, did Putnam disclose the employee market timing to fund boards or to fund shareholders, until the October 2003 press release described above.

31.    As a result of the conduct described in section III above, Putnam willfully violated Sections 206(1) and 206(2) of the Advisers Act in that it, while acting as an investment adviser, employed devices, schemes, or artifices to defraud clients or prospective clients; and engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients. Specifically, Putnam knowingly, recklessly and/or negligently failed to disclose to the boards of mutual funds it managed that certain investment management professionals were engaging in potentially self-dealing short-term securities trading. Accordingly, Putnam willfully violated Sections 206(1) and 206(2) of the Advisers Act.

Scanned on OCT 17, 2005

32. As a result of the conduct described in section III above, Putnam willfully violated Section 204A of the Advisers Act in that it, while acting as an investment adviser, failed to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse of material, nonpublic information by such investment adviser or any person associated with such investment adviser. Putnam failed to take adequate steps to detect and deter short-term trading of Putnam funds by its portfolio managers and other investment professionals who had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders. Accordingly, Putnam willfully violated Section 204A of the Advisers Act.

33. Rule 17j-1(c), promulgated under Section 17(j) of the Investment Company Act, requires every registered investment company, and its investment adviser, to, among other things, use reasonable diligence and institute procedures reasonably necessary to prevent violations of their code of ethics. After prohibiting market timing in its code of ethics in 2002, Putnam failed to use reasonable controls to monitor and detect such activity by its employees. Accordingly, Putnam willfully violated Section 17(j) of the Investment Company Act and Rule 17(j)-1(c) thereunder.

34. As a result of the conduct described in section III above, Putnam failed reasonably to supervise certain employees, including Scott and Kamshad, who were persons subject to Kamshad's supervision, with a view to preventing their violations of Sections 206(1) and 206(2) of the Advisers Act. Putnam failed to adopt and implement procedures reasonably designed to detect or prevent the violations of Scott, Kamshad and other employees. Accordingly, Kamshad failed reasonably to supervise within the meaning of Section 203(e)(6) of the Advisers Act.

Defendants' failures to disclose and misrepresentations concerning the above and foregoing acts and omissions by Defendants were a producing cause of ERS' injuries.

31. In addition to the foregoing, Defendants violated the DTPA by making false representations, including the following:

a. they had a "60-year tradition of integrity." To the contrary, Defendants designated Kamshad and Scott to be "key investment personnel" assigned to advise ERS, even though Defendants knew before they made their representations to ERS

15

that Kamshad and Scott had engaged in improper and unethical market timing at the expense of Putnam investors and in violation of the Defendants' fiduciary duties to the investors. Defendants failed to discipline Kamshad and Scott for improper trading; indeed, they promoted them to positions of greater responsibility, even though at least Kamshad continued engaging in market timing trades from 1998 until well into 2003.

        b.    they were in compliance with laws and regulations of the SEC, DOL and other regulatory agencies. To the contrary, Defendants were not in compliance with the laws and regulations of the SEC and other regulatory agencies, as evidenced by the SEC's findings and also by the fact that they agreed to pay fines and restitution totaling more than $100 million for conduct occurring before and during the term of the Contract.

        c.    Kamshad was a CFA, implying that he complied with the AIMR Standards of Professional Conduct. Kamshad did not in fact comply with the AIMR Standards, which require CFAs to act with integrity and to refrain from engaging in professional misconduct, including dishonesty, fraud, deceit and misrepresentation. Kamshad was also required by the AIMR Standards to disclose conflicts of interest. He violated these and numerous other AIMR standards, and Defendants knowingly and intentionally failed to disclose the violations when they had a duty to disclose them, and affirmatively misrepresented by implication that Kamshad had complied with those standards. Defendants' knowingly and intentionally misrepresented that Kamshad had complied with the AIMR standards, and they failed to disclose Kamshad's violations of the standards in order to induce ERS to enter into the Contract.

16

Scanned on OCT 17, 2005

32.    Acting with the intent to induce ERS to enter into the Contract, Defendants also knowingly failed to disclose when they had a duty to disclose the following material information:

a.    Kamshad, Scott and other employees of Defendants had been engaging in improper market timing activity since 1998;

b.    certain Putnam mutual fund owners had been allowed by Putnam to engage in market timing activity, to the detriment of the long-term investors in those funds;

c.    Defendants lacked adequate controls to monitor such market timing activity and to prevent it from occurring.

33.    ERS reasonably relied on the foregoing misrepresentations and failures to disclose when it decided to enter into the Contract and thereafter. If ERS had known the truth, it would not have contracted with PAC. The misrepresentations and failures to disclose were a producing cause of ERS' damages.

34.    As a result of Defendants' wrongful acts and omissions, ERS suffered damages in excess of the minimum jurisdictional limits of this Court.

35.    Defendants made the misrepresentations and failed to disclose material information knowingly and/or intentionally. Accordingly, ERS seeks recovery of additional damages as authorized by section 17.50(b)(1) of the DTPA.

36.    ERS seeks recovery of its reasonable and necessary attorney's fees and court costs in accordance with section 17.50(d) of the DTPA.

17

**B.    Fraud**

37.    Plaintiff ERS repeats and re-alleges each and every allegation set forth in paragraphs 12-26.

38.    Defendants made material misrepresentations to ERS with knowledge of their falsity, or they made material misrepresentations recklessly without any knowledge of their truth and as a positive assertion. In particular, Defendants represented that:

a.    they had a "60-year tradition of integrity." To the contrary, Defendants designated Kamshad and Scott to be "key investment personnel" assigned to advise ERS, even though Defendants knew before they made their representations to ERS that Kamshad and Scott had engaged in improper and unethical market timing at the expense of Putnam investors and in violation of the Defendants' fiduciary duties to the investors. Defendants failed to discipline Kamshad and Scott for improper trading; indeed, they promoted them to positions of greater responsibility, even though at least Kamshad continued engaging in market timing trades from 1998 until well into 2003.

b.    they were in compliance with laws and regulations of the SEC, DOL and other regulatory agencies. To the contrary, Defendants were not in compliance with the laws and regulations of the SEC and other regulatory agencies, as evidenced by the SEC's findings and also by the fact that they agreed to pay fines and restitution totaling more than $100 million for conduct occurring before and during the term of the Contract.

c.    Kamshad was a CFA, implying that he complied with the AIMR Standards of Professional Conduct. Kamshad did not in fact comply with the AIMR Standards, which require CFAs to act with integrity and to refrain from engaging in

18

Scanned on OCT 17, 2005

professional misconduct, including dishonesty, fraud, deceit and misrepresentation. Kamshad was also required by the AIMR Standards to disclose conflicts of interest. He violated these and numerous other AIMR standards, and Defendants knowingly and intentionally failed to disclose the violations when they had a duty to disclose them, and affirmatively misrepresented by implication that Kamshad had complied with those standards. Defendants' knowingly and intentionally misrepresented that Kamshad had complied with the AIMR standards, and they failed to disclose Kamshad's violations of the standards in order to induce ERS to enter into the Contract.

39.     Defendants had special knowledge that the foregoing representations were false, and Defendants made misrepresentations and failures to disclose when they had a duty to make the disclosures to ERS with the intention that ERS would rely on those misrepresentations when it entered into the Contract. ERS did in fact rely on Defendants' misrepresentations and suffered injury as a result of the misrepresentations.  If ERS had known the truth, it would not have contracted with PAC.

40.     Defendants also committed fraud by failing to disclose when they had a duty to disclose the following material facts within their knowledge:

a.     Kamshad, Scott and other employees of Defendants had been engaging in improper market timing activity since 1998;

b.     certain Putnam mutual fund owners had been allowed by Putnam to engage in market timing activity, to the detriment of the long-term investors in those funds;

c.     Defendants lacked adequate controls to monitor such market timing activity and to prevent it from occurring.

41.     Defendants knew that ERS was ignorant of the foregoing facts, and Defendants knew that ERS did not have an equal opportunity to discover the truth.  By failing to disclose the information when they had a duty to disclose it, Defendants intended to induce ERS to enter into the Contract, and ERS did in fact enter into the Contract without knowledge of the facts misrepresented and concealed by Defendants. Had Defendants disclosed the information they had an obligation to disclose, ERS would not have entered into the Contract and would not have suffered injury from Defendants' wrongful acts and omissions.

42.     As a result of Defendants' fraudulent acts and omissions, ERS suffered actual damages in excess of the minimum jurisdictional limits of this Court.  ERS also seeks disgorgement of all fees paid under the Contract.

**C.     Breach of Contract**

43.     Plaintiff ERS repeats and re-alleges each and every allegation set forth in paragraphs 12-26.

44.     As discussed above, ERS entered into the Contract with Defendants effective December 1, 2002.  Defendants breached the Contract in numerous respects:

a.      Defendants agreed to comply with all applicable state and federal laws and regulations, but Defendants breached that agreement by failing to halt improper trading by Kamshad, Scott, other Putnam employees and certain Putnam customers.

b.      Defendants agreed that they would maintain regulatory compliance with the Securities and Exchange Commission, the Department of Labor, and any other applicable regulatory agency.  Defendants breached that agreement by failing to halt

20

market timing trading by Kamshad, Scott, other Putnam employees and certain Putnam customers.

        c.      Defendants agreed to immediately notify ERS of any violations or investigations into potential violations alleged to be committed by Defendants by any regulatory agency.  Among other failures to notify, Defendants breached that agreement by failing to notify ERS that market timing trading was occurring and by failing to notify ERS that the SEC and Massachusetts were investigating PIM, Kamshad and Scott. Defendants knew no later than September 11, 2003 that PIM was being investigated by Massachusetts, but Defendants failed to disclose that investigation until after media reports about the investigation appeared in late October 2003.

        d.      On several occasions in 2002 and 2003, Defendants overstepped their advisory role by executing stock transactions without ERS' knowledge or consent. Because ERS has a constitutional, non-delegable duty to invest funds of the retirement system, Defendants' unauthorized trades violated Texas law and the ERS Investment Policy, in violation of the Contract.

        e.      Defendants agreed to notify ERS immediately of any material change in their personnel, ownership, or its business strategy, mix or functionality. Defendants breached that agreement by failing to notify ERS timely that Kamshad and Scott had been relieved of responsibility for the ERS portfolio.

        f.      Defendants expressly agreed to indemnify ERS from all claims, damages, losses, expenses, judgments or any other amounts resulting from their employees' negligent acts or omissions, willful misfeasance, bad faith, recklessness or gross negligence arising from or related to Defendants' performance under the Contract.

Despite a letter from ERS seeking indemnification from Defendants, Defendants have refused to indemnify ERS for losses resulting from Defendants' employees' negligent acts or omissions, willful misfeasance, bad faith, recklessness or gross negligence.

g.   PAC represented in the Contract that Defendants were able to recommend a portfolio consistent with ERS' Investment Policy.   Although the Investment Policy allowed international investments only in countries domiciled in Europe, Australasia and the Far East, Defendants refused to work with ERS on a mandate that included only those regions.

h.   Defendants represented in the Contract that Defendants could advise and assist ERS with its international portfolio.  After being selected as an advisor, however, Defendants admitted that they did not have the capacity to advise and assist with respect to the entire international portfolio.

i.   PAC violated its fiduciary obligations to ERS.  Article XII of the Contract provides:

> Advisor [PAC] undertakes to perform the services under this Contract in utmost good faith, loyalty, candor, skill, and due diligence.

45.   After Kamshad's termination, Putnam assigned Josh Byrne to perform a portion of Kamshad's duties at Putnam.  Prior to assignment of the additional duties, Mr. Byrne was the person most directly involved in advising ERS' investment staff on a day-to-day basis regarding the portion of ERS' international equity portfolio assigned to Putnam.  His assumption of additional duties following Kamshad's termination resulted in the immediate disruption of Putnam's ability to provide timely and competent investment advisory services required under the Contract.  In addition, the regulatory actions and adverse publicity surrounding the disclosure of Kamshad's, Scott's and the

22

Putnam affiliates' long-term illegal conduct further disrupted and interfered with Putnam's ability to perform its obligations under the Contract. As a result of Defendants' breaches of the Contract, ERS has suffered damages in excess of the jurisdictional limits of this Court.

**D.    Negligent Misrepresentation**

46.    Plaintiff ERS repeats and re-alleges each and every allegation set forth in paragraphs 12-26.

47.    Defendants made misrepresentations in the course of their business or in a business in which they had a pecuniary interest. Defendants intended for ERS to rely on, and ERS did rely on, those misrepresentations when it decided to retain PAC as an advisor. Defendants failed to exercise reasonable care or competence in obtaining or communicating the information to ERS.

48.    Specifically, Defendants represented that:

a.    they had a "60-year tradition of integrity." In fact, Defendants designated Kamshad and Scott to be "key investment personnel" assigned to advise ERS, even though Defendants undoubtedly knew that Kamshad and Scott had engaged in improper and unethical market timing at the expense of Putnam investors and in violation of the Defendants' fiduciary duties to the investors. Defendants failed to discipline Kamshad and Scott for improper trading; indeed, they promoted them to positions of greater responsibility, even though at least Kamshad continued engaging in market timing trades well into 2003.

b.    they were in compliance with laws and regulations of the SEC, DOL and other regulatory agencies. Defendants were not in compliance with the laws

23

and regulations of the SEC and other regulatory agencies, as evidenced by the fact that Defendants agreed to pay fines and restitution totaling more than $100 million for conduct occurring before and during the term of the Contract.

        c.     Kamshad was a CFA, implying that he complied with the AIMR Standards of Professional Conduct. Kamshad did not in fact comply with the AIMR Standards, which require CFAs to act with integrity and to refrain from engaging in professional misconduct, including dishonesty, fraud, deceit and misrepresentation. Kamshad was also required by the AIMR Standards to disclose conflicts of interest. He violated these and numerous other AIMR standards, and Defendants negligently misrepresented by implication that Kamshad had complied with those standards.

        49.     ERS justifiably relied on the negligent misrepresentations of Defendants, and as a result ERS has suffered damages in excess of the minimum jurisdictional limits of the Court.

**E.    Breach of Fiduciary Duty**

        50.     Plaintiff ERS repeats and re-alleges each and every allegation set forth in paragraphs 12-26.

        51.     Defendants had a fiduciary duty to ERS because a contractual relationship of trust and confidence existed between the parties. As fiduciaries, Defendants owed ERS a duty of loyalty and good faith, a duty of candor, a duty to refrain from self-dealing, and a duty of full disclosure.

        52.     Defendants violated their fiduciary duty to ERS by placing their own interests above the interests of ERS when they failed to disclose that their own employees and other investors engaged in market-timing activities at the expense of long-term

investors. Defendants also placed their own interests above the interests of ERS by failing to disclose information that they knew would have affected ERS' decision to enter into the Contract and to remain a party to the Contract.

53.    Defendants also violated their fiduciary duty to ERS, a governmental trust fund, by failing to fully and fairly disclose information important to ERS concerning the dealings between the parties. Specifically, Defendants failed to disclose to ERS that the Defendants' employees in charge of ERS' international portfolio had engaged in market timing conduct and that Scott and Kamshad were continuing to engage in market timing conduct at the time the Contract was signed. Defendants also failed to disclose that they had allowed other customers to engage in market timing, to the detriment of long-term investors.

54.    ERS suffered damages in excess of the minimum jurisdictional limits of this Court as a result of Defendants' breach of their fiduciary duty to ERS. In addition, because of PAC's breaches of fiduciary duty, ERS is entitled to a disgorgement and restitution of fees paid to PAC.

**F.    Violation of Texas Securities Laws**

55.    Plaintiff ERS repeats and re-alleges each and every allegation set forth in paragraphs 12-26.

56.    Defendants are "investment advisers" as that term is defined in article 581-4 of the Texas Securities Act. Tex. Rev. Civ. Stat. art. 581-4(N) (Vernon Supp. 2004-05).

57.    Article 581-33 of the Texas Securities Act provides that an investment adviser who commits fraud or engages in a fraudulent practice in rendering service as an

25

investment adviser is liable to the purchaser of the securities. Defendants committed fraud by failing to disclose that the "key investment personnel" assigned to advise and assist ERS had engaged in illegal market timing and were continuing to engage in market timing during the term of the Contract.

58.    As a result of Defendants' violation of the Texas Securities Act, ERS suffered damages in excess of the minimum jurisdictional limits of this Court. ERS seeks recovery of those damages.

59.    Article 581-33-1(E) provides that a person who controls or materially aids an investment adviser is jointly and severally liable with the investment adviser in an action to recover damages from the investment adviser. If, and to the extent that, any of the Defendants is not considered to be an "investment adviser," that Defendant is nevertheless jointly and severally liable for ERS' damages because the Defendant controlled and/or materially aided the investment adviser in defrauding ERS.

60.    ERS seeks recovery of court costs and reasonable attorney's fees as allowed by article 581-33-1(B)(4).

BASES FOR JOINT AND SEVERAL LIABILITY

**A.    Civil Conspiracy**

61.    Plaintiff ERS repeats and re-alleges each and every allegation set forth in paragraphs 12-26.

62.    Defendants entered into an agreement or combination to accomplish by a common plan the violations of the DTPA and the acts of fraud and breach of fiduciary duty, and by their actions Defendants demonstrated the existence of an agreement and combination. As described above in connection with the DTPA, fraud and breach of

26

Scanned on OCT 17, 2005

fiduciary duty causes of action, one or more Defendants provided false information and failed to disclose material information. Such acts and omissions constitute overt acts to further the object or common purpose of the conspiracy.

63.    ERS suffered injury as a result of Defendants' agreement to accomplish the illegal and tortious acts, and all Defendants are jointly and severally liable for ERS' damages.

**B.    Aiding and Abetting**

64.    As set forth in detail above, Defendants committed a number of torts, including fraud, breach of fiduciary duty and negligent misrepresentation. To the extent any particular Defendant disclaims liability for committing those torts directly, each Defendant is nevertheless jointly and severally liable for the torts because each Defendant aided and abetted in the commission of the torts. It is indisputable that each Defendant knew about the others' torts, because they had the same officers and employees. Each Defendant had the intent to assist or encourage the other Defendants in committing the torts, as evidenced by, among other things, the fact that PAC warranted that Putnam's answers to the Questionnaire were correct. The intent to assist is also evidenced by the fact that Defendants all knew that Kamshad, Scott and others were trading improperly but failed to halt that trading. Each Defendant did in fact assist or encourage other Defendants in committing the torts. The Defendants' assistance or encouragement was a substantial factor in causing the torts and in causing ERS' injuries. Accordingly, all Defendants are liable for the damages caused to ERS.

27

Scanned on OCT 17, 2005

## C.    Piercing the Corporate Veil

65.    All Defendants are jointly and severally liable for the erroneous acts and omissions of each Defendant because Defendants essentially operated as a single business enterprise. Both PIM and PAC are subsidiaries of Putnam, and all three entities shared officers and employees during the period at issue. For example, PAC's own Form ADV, which was filed with the SEC and warranted to be true by PAC, reveals that literally dozens of officers and employees, including Kamshad and Scott, were Managing Directors of Putnam, PAC and PIM simultaneously during the relevant time period. In addition, all three Defendants had the same chief executive officer, chief financial officer, chief legal officer and chief compliance officer during that time. Defendants also shared research and trading facilities, and they aggregated their purchases and sales of securities.

66.    Defendants also operated as a single business enterprise insofar as their interactions with ERS were concerned. The response to the Questionnaire was ostensibly by "Putnam Investments," but it also answered on behalf of PAC and PIM and represented that investment management was provided by its subsidiaries, including PAC and PIM. Moreover, PAC represented in the Contract that all of Putnam's responses to the Questionnaire were true and correct.

67.    Because Defendants effectively operated as a single business enterprise, it is appropriate to pierce the corporate veil under Texas law and to impose joint and several liability for all of the causes of action discussed herein.

### ATTORNEY'S FEES

68.    ERS has found it necessary to retain counsel to pursue damages caused by Defendants' breaches of the Contract. Accordingly, ERS seeks recovery of reasonable

28

and necessary attorney's fees pursuant to chapter 38 of the Texas Civil Practice and Remedies Code.

69.     As noted above in paragraphs 36 and 60, ERS also seeks recovery of its attorney's fees and court costs in accordance with section 17.50(d) of the DTPA and article 581-33-1 of the Texas Securities Act.

## EXEMPLARY DAMAGES

70.     The fraud committed by Defendants is the kind of wrong for which the law allows the recovery of exemplary damages. Tex. Civ. Prac. & Rem. Code § 41.003. Defendants made material representations that were false, and they either knew the representations were false or acted with reckless disregard as to the truth of those representations. Defendants intended that the representations be acted on by ERS, and ERS did in fact rely on those representations and suffered injury as a result. Accordingly, ERS seeks recovery of exemplary damages from Defendants in an amount within the jurisdictional limits of this Court.

71.     The breach of fiduciary duty committed by Defendants is also the kind of wrong for which the law allows exemplary damages. Defendants had a fiduciary relationship with ERS, and they breached that relationship by knowingly making misrepresentations and withholding information they had a duty to disclose. Defendants also breached their fiduciary relationship by knowingly engaging in self-dealing. The breach of fiduciary relationship caused injury to ERS. Accordingly, ERS seeks recovery of exemplary damages from Defendants in an amount within the jurisdictional limits of this Court.

29

## CONDITIONS PRECEDENT

72.     ERS has satisfied all conditions precedent to recovery of attorney's fees and to recovery under the DTPA.

## DEMAND FOR JURY

73.     Plaintiff ERS demands a jury trial and tenders the appropriate fee with this petition.

## REQUEST FOR DISCLOSURE

74.     Under Texas Rule of Civil Procedure 194, Plaintiff ERS requests that Defendants disclose within 50 days of the service of this request the information or material described in Rule 194.2(a), (b), (c), (e), (f), (g), (i) and (l).

## PRAYER

For the foregoing reasons, Plaintiff ERS asks that Defendants be cited to appear and answer, and that after trial Plaintiff have judgment against Defendants for the following:

a.     actual damages;

b.     additional damages authorized by section 17.50 of the DTPA;

c.     disgorgement of all fees paid to Defendants;

d.     exemplary damages;

e.     prejudgment and postjudgment interest;

f.     costs of suit;

g.     attorney's fees for all stages of litigation; and

h.     all other relief, in law and in equity, to which Plaintiff may be entitled.

Scanned on OCT 17, 2005

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY
A Professional Corporation
401 Congress Avenue, Ste. 2200, Austin TX 78701
P.O. Box 98, Austin TX 78767
512/480-5616
FAX: 512/480-5816

By: _____

John J. McKetta, III
State Bar No. 13711500
David H. Donaldson
State Bar No. 05969700
Ron H. Moss
State Bar No. 14591025

ATTORNEYS FOR PLAINTIFF
EMPLOYEES RETIREMENT SYSTEM
OF TEXAS



**GRAVES DOUGHERTY HEARON & MOODY**

A PROFESSIONAL CORPORATION

**Ron H. Moss**
512.480.5724
512.480.5824 (fax)
rmoss@gdhm.com

MAILING ADDRESS
P.O. Box 98
Austin, TX 78767

October 17, 2005

Filed In The District Court
of Travis County, Texas
on ___10-27-05___
at ___11:25___ ___A___.M.
Amalia Rodriguez-Mendoza, Clerk

Ms. Amalia Rodriguez-Mendoza
District Clerk
Travis County Courthouse
1000 Guadalupe
Austin, Texas  78701

Re:    Cause No. _GN503755_ *Employees Retirement System of Texas v. Putnam, LLC d/b/a Putnam Investments, Putnam Investment Management, LLC and The Putnam Advisory Company, LLC* in the *200th* Judicial District Court of Travis County, Texas.

Dear Ms. Rodriguez-Mendoza:

Enclosed for filing in the above-reference cause please find the original and eight copies of *Plaintiff's Original Petition*.

Please file the original, return two file-marked copies to my office with the person delivering these documents, prepare the citations for the three defendants in this case and attach the remaining six copies of the petition to those citations – two for each citation.

Also enclosed is a LegalEase form for charging the filing fee for the petition and preparation of the citations and service of the citations through the constable's office and a check in the amount of $165.00 payable to the Secretary of State for their separate issuance fee.

*Attached to the Cits.*

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY
Professional Corporation

By: Ron H. Moss

Enclosures

RHM:bec

CAUSE NO. GN503755

| | | |
|---|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF TEXAS, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| vs. | § § | TRAVIS COUNTY, TEXAS |
| PUTNAM, LLC d/b/a/ PUTNAM INVESTMENTS, PUTNAM INVESTMENT MANAGEMENT, LLC, and THE PUTNAM ADVISORY COMPANY, LLC, | § § § § § § | |
| Defendants. | § | 200TH JUDICIAL DISTRICT |

## DEFENDANTS' ORIGINAL ANSWER

Putnam, LLC ("Putnam"), Putnam Investment Management, LLC, ("PIM"), and The Putnam Advisory Company, LLC ("PAC") (collectively "Defendants") file this Original Answer to the Original Petition of Plaintiff Employees Retirement System of Texas ("ERS" or "Plaintiff"), and would respectfully show the Court the following:

### I.    GENERAL DENIAL

1.    Defendants deny each and every, all and singular, the allegations in Plaintiff's Original Petition in accordance with TEX. R. CIV. P. 92. Defendants demand strict proof of all allegations made by Plaintiff, all as required by law. Defendants further reserve the right to answer in greater particularity reasonably in advance of the trial hereof.

### II.    SPECIAL DEFENSES

2.    Plaintiff's claim under the Texas Deceptive Trade Practices Act fails as a matter of law because the transaction or set of transactions in question at issue involve total consideration by the ERS in excess of $500,000 and do not involve a residence. *See* TEX. BUS. & COM. CODE § 17.49(f) and (h).

EXHIBIT
4

## III. PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants pray that upon trial hereof, Plaintiff take nothing against Defendants, and that Defendants have judgment for their costs and such other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

Shannon H.  Ratliff,
State Bar No. 16573000
Lisa A. Paulson
State Bar No. 00784732
Ryan A. Botkin
State Bar No. 00793366
Ratliff Law Firm
600 Congress Street, Suite 3100
Austin, TX  78701
512-493-9600 (Telephone)
512- 493-9625 (Facsimile)

Charles W. Schwartz
State Bar No. 17861300
Noelle M. Reed
State Bar No. 24044211
Skadden, Arps, Slate, Meagher & Flom LLP
1600 Smith, Suite 4400
Houston, TX 77002
713-655-5160 (Telephone)
888-329-2286 (Facsimile)

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document, DEFENDANTS' ORIGINAL ANSWER, was served by facsimile on November 21, 2005, on all counsel of record.


**Via Facsimile No.: 512-480-5616**
John J. McKetta, III
David H. Donaldson
Ron H. Moss
GRAVES, DOUGHERTY, HEARON
    & MOODY
401 Congress Avenue, Suite 2200
Austin, Texas  78767

_____
Ryan A. Botkin

TATE OF TEXAS     §
COUNTY OF TRAVIS     §
     §

## CONTRACT

WHEREAS, the Employees Retirement System of Texas ("ERS") issued an International Equity Advisor Questionnaire ("Questionnaire") on January 29, 2001, which is attached hereto as Exhibit "A" and is fully incorporated herein for all purposes as if restated in full; and

WHEREAS, the Putnam Advisory Company, LLC, ("Advisor") submitted its Response to the Questionnaire (the "Proposal"), received by ERS on March 2, 2001 to provide international equity advisory services. A copy of the Proposal is attached hereto as Exhibit "B" and, except as otherwise provided in the Contract, is incorporated herein for all purposes as if restated in full; and

WHEREAS, on November 19, 2002, at a meeting of the Investment Advisory Committee (the "IAC") and the ERS Board of Trustees (the "Board"), Advisor was interviewed by the Board and IAC and made its presentation in support of its Proposal to advise ERS as to its international equity investments and to assist the Board in investing assets of ERS; and

WHEREAS, in reliance on the Proposal, Advisor's material statements and representations, and the IAC's recommendation, on November 19, 2002, the Board accepted Advisor's Proposal to provide investment advisory services beginning effective December 1, 2002 through November 30, 2005;

NOW THEREFORE, for and in consideration of the mutual promises, covenants, and consideration herein expressed, this Contract is entered into by and between Advisor and ERS, and the parties agree as follows:

## I. Conformity with ERS Investment Policy

Advisor agrees to provide international equity advisory services as represented in the Questionnaire, the Proposal and Advisor's presentation to the IAC and the Board, with respect to an active international equity portfolio for which Advisor agreed to provide investment advisory services (the "Portfolio"), subject to applicable Texas, constitutional, statutory, regulatory and common law, and the ERS Investment Policy, dated August 21, 2002, and as it may be amended in the future (the "Policy"), provided, however, that Advisor shall not be subject to any amendment to the ERS Investment Policy until such time as Advisor has received a copy of such amendment. The ERS Investment Policy, as it may be amended from time to time, is attached hereto as Exhibit "C" and is ıcorporated herein for all purposes as if restated in full. If any such change requires Advisor to provide immediate advice to adjust the then existing international equity portfolio, Advisor shall have



ALL-STATE LEGAL®    EXHIBIT

5

reasonable time to implement such policy. For purposes of this Contract, receipt of any document or notice is deemed established by a return receipt signed by an officer, employee or representative of the recipient party, if the document or notice is sent by certified mail, return receipt requested, or by a telecopy transmittal record proving telephonic transmittal of the document or notice to the recipient party.

Advisor's performance evaluation relative to the performance benchmark, as described in Exhibit "C," will begin on the first of the month thirty (30) days following Advisor's commencement of advisory services as provided herein.

## II. Contract Term, Extensions and Amendments

The term of this Contract is December 1, 2002 through November 30, 2005. This Contract may be renewed by ERS for a subsequent one (1) year period. If so renewed, it shall be under the same terms and conditions provided in this Contract unless applicable law mandates that provisions be added to or deleted therefrom. Additional renewals, if any, for the succeeding years will not be automatic, but will be at the discretion of ERS, and may be for subsequent one (1) year periods upon terms and conditions to be agreed upon by the parties in writing. Any alterations, modifications or amendments to the Contract must also be in writing and be executed by all parties.

## III. Fees

ERS will pay to Advisor the sum of $2,950,000 (Two Million Nine Hundred and Fifty Thousand Dollars) for the first year of the Contract, which shall be made in equal quarterly installments. For the second and third years of the Contract, the per annum fee will be adjusted to reflect the market value of the Portfolio at the end of the prior year, based on ERS' pricing sources. The amounts will be determined by multiplying the assets invested as of December 31, 2003 and December 31, 2004, respectively, by the following fee rate formula:

The first $500,000,000 (Five Hundred Thousand Dollars) in Portfolio assets times .005; and

Any amounts over $500,000,000 (Five Hundred Thousand Dollars) in Portfolio Assets times .0045.

ERS will promptly process purchase vouchers for the payment of such services. Billings submitted by Advisor to ERS shall be itemized in a manner acceptable to ERS.

ERS is a part of the Executive Branch of Texas State Government and is, therefore, a tax ¬xempt organization. Any fees to be paid by ERS in connection herewith do not include taxes of any kind, and have not been increased to compensate for the fact that ERS is tax exempt.

## IV. Termination

ERS may terminate this Contract immediately for cause, in addition to its exercise of any other legal, equitable or contractual remedies it may have. "Cause" is defined as a material breach of the terms of this Contract, as reasonably determined by ERS. ERS may also terminate this Contract at any time and without cause by giving Advisor thirty (30) days written notice of ERS' intent to terminate. This Contract also may be terminated at any time with the written mutual consent of the parties. Advisor may terminate the Contract without cause on 180 days written notice to ERS.

## V. Services

The international equity advisory services that Advisor agrees to provide with respect to the Portfolio are described in the attached Exhibits "A" and "B" and include, but are not limited to the following:

(a) Provide consultation and advice to ERS as needed on matters relating to ERS' international equity investments, including analysis of business, market, and economic conditions relative to such investments;

(b) Provide advice to ERS on portfolio construction, including, but not limited to specific securities recommended for purchase, sale, or exchange;

(c) Provide training to the ERS investment staff in support of the international equity allocation on an as-needed basis;

(d) Provide advice to ERS as needed on strategic planning for the international equity allocation;

(e) Pay reasonable travel expenses (including transportation, meals and lodging) for one representative of ERS to travel annually to Advisor's principal place of business, or to such alternative location as may be agreed upon by the parties as reasonably appropriate for such annual meeting, to perform a due diligence review of Advisor to ensure that it is performing its obligations under the Contract;

(f) Attend IAC and Board meetings as reasonably required by the Executive Director, and consult with the ERS staff as reasonably requested by ERS; and

(g) Advise ERS concerning any changes known to Advisor in any state, federal or foreign laws, regulations or treaties affecting the Portfolio.

Any conflict, ambiguity or inconsistency between the provisions of the Contract, the Questionnaire (Exhibit "A"), the Proposal (Exhibit "B") and the Policy (Exhibit "C") shall be resolved

·y applying the following descending order of preference: (1) the Policy; (2) the Contract; (3) the Questionnaire; and (4) the Proposal. A higher order document shall supersede a lower order document to the extent necessary to resolve any conflicts, ambiguities or inconsistencies between them, but silence on any matter in a higher order document shall not negate or modify the provisions of a lower order document as to that matter.

## VI. Governing Law

This Contract will be construed in conformity with and enforced in accordance with the laws of the State of Texas. Jurisdiction and venue of any action in connection with this Contract or the parties' relationship shall be in Texas State District Court in Travis County, Texas. To the extent the laws of the State of Texas or the United States require ERS to include additional language in its contracts, Advisor agrees to amend this Contract and to cooperate in the execution of any contract amendment necessary to effectuate such law. Advisor further agrees that it will comply with any applicable Board rules currently in effect or that may be promulgated in the future, provided a copy of such rules has been received by Advisor so long as, to the extent of any amendment to such rules after the effective date of the Contract, compliance with such rules is lawful and will not have a material adverse effect ᴏn Advisor. The parties agree and acknowledge that nothing contained herein shall in any manner be construed as a waiver of sovereign (governmental) or official immunity by ERS, its officers, directors, trustees, employees and agents, or the State of Texas, its officers and employees or agents, nor does ERS' acceptance of any benefits under this Contract constitute any waiver, express, implied or otherwise, of sovereign immunity to suit or liability of ERS, its officers, directors, trustees, agents or employees.

## VII. Debts and Delinquent Taxes

Under Tex. Gov't Code Ann. § 403.055 and § 2155.004 (Vernon Supp. 2002), Advisor certifies that it is not ineligible to receive this Contract, it acknowledges that the Contract may be terminated and payment withheld if this certification is inaccurate, and in the event Advisor is indebted to the State of Texas or delinquent in paying any taxes owed the State of Texas at the time this Contract is entered into, Advisor agrees that any payment owed to Advisor under this Contract shall first be applied towards the debt or delinquent taxes that Advisor owes the State of Texas until the debt or delinquent taxes are paid in full. Advisor warrants and represents that at the time it entered into this ᴄontract, Advisor was not indebted to the State of Texas or delinquent in paying any taxes owed the State of Texas.

## VIII. Independent Contractor

Advisor and ERS understand and agree that Advisor is an independent contractor providing the advisory services and any materials described in this Contract. It is expressly understood and agreed by the parties hereto that personnel assigned by Advisor to perform any of the services hereunder are employees of Advisor, and are not employees of ERS or the State of Texas for any purpose. Therefore, as an independent contractor, Advisor agrees that its employees are not eligible for or entitled to receive any retirement benefits as a member of the employee class pursuant to Tex. Gov't Code Ann. § 812.003 (Vernon 1994), or any insurance benefits as a member of the employee class pursuant to Tex. Ins. Code Ann. art. 3.50-2 (Vernon 1981 & Supp. 2002), or any other kind of benefit ordinarily provided by the State of Texas to its employees. Further, Advisor shall be responsible for obtaining, paying and maintaining all insurance and payroll withholding obligations that may be required by state or federal law in its performance of this Contract, including, but not limited to federal and state payroll taxes, and workers compensation insurance, if required. No employer responsibilities to such personnel are, or may be, assumed by ERS, its officers or employees, the ERS Board of Trustees, or the State of Texas. In addition, prior to entering into the Contract, ERS determined that, pursuant to Tex. Gov't Code Ann. § 2161.252 (Vernon 2000), there will be no subcontracting opportunities under this Contract.

## IX. Indemnity

**Advisor shall indemnify, save, and hold harmless ERS, its officers, trustees, employees, and the State of Texas, from any and all claims, damages, losses, causes of action, expenses, judgments, or any other amounts, including, but not limited to attorney's fees and costs, arising out of Advisor's or Advisor's employees and/or agents' negligent acts or omissions, willful misfeasance, bad faith, recklessness or gross negligence arising from or related to Advisor's performance under the Contract.**

## X. Changes in Ownership and Personnel

Advisor will notify ERS of any changes in the membership of its ownership within a reasonable time after such change. Advisor also agrees to notify ERS immediately of any material change in its personnel, ownership, or its business strategy, mix, or functionality. Advisor agrees to comply with all applicable state and federal laws and regulations. Advisor will maintain regulatory compliance with the Securities and Exchange Commission, Department of Labor, and any other applicable regulatory agency. Advisor shall immediately notify ERS of any violations or investigations into potential violations alleged to be committed by Advisor by any regulatory agency,

ɔr by any written pleading or complaint filed by any person or entity, which might reasonably have a material adverse effect on Advisor's ability to perform its duties or obligations hereunder. If ERS is not satisfied with any organizational change, as reflected in this section and as it may relate to Advisor's performance under the Contract, or if ERS learns that Advisor has otherwise violated the terms of this section, then ERS may terminate this Contract immediately.

## XI.  Form ADV

ERS hereby acknowledges receipt of Part II of Advisor's Form ADV, and Advisor warrants and represents that it is true and correct in all respects.

## XII.  Good Faith

Advisor undertakes to perform the services under this Contract in utmost good faith, loyalty, candor, skill, and due diligence.  Advisor shall not assign any of its duties or responsibilities under this Contract to any other person or entity.  ERS may terminate this Contract immediately if any such improper assignment is made.

## XIII.  Additional Warranties and Representations

Advisor warrants and represents that all material written and verbal statements and ⸲epresentations made to ERS in Advisor's Proposal and during the interview and selection process and during the negotiation of and within this Contract are true and correct as of the date such statements were made.  Advisor shall immediately notify ERS in the event any such warranties, representations and/or statements are no longer true and correct.  Advisor acknowledges that these statements and representations have been relied upon by ERS in selecting Advisor to perform the services described in the Contract.

## XIV.  Family Code Certification

Pursuant to Tex. Gov't Code Ann. § 231.006 (Vernon Supp. 2002), Advisor certifies that Advisor is not ineligible to receive payment for the services specified in this Contract and acknowledges that this Contract may be terminated and payment may be withheld if this certification is inaccurate.  Attached to the Contract as Exhibit "D" and incorporated herein for all purposes as if restated in full is a list of all persons, if any, with at least 25% ownership of Advisor along with the Social Security number of all such persons.

## XV.  Legal Authority

To ensure that the individual executing this Contract has legal authorization to do so and that this authorization legally binds Advisor to this Contract, Advisor has attached the document(s)

escribed in either (a), (b) or (c) below as Exhibit "E" which are incorporated herein for all purposes as if restated in full:

(a) A certified copy of the provision in Advisor's by-laws which authorizes the person who executes this Contract to execute contracts generally on behalf of Advisor and an affidavit from the Secretary to Advisor's governing body certifying that the authorization has not expired or been revoked or superseded; or

(b) A certified copy of a resolution from Advisor's governing body that authorizes the person who signs this Contract to execute this particular Contract or contracts generally on behalf of Advisor; and an affidavit from the Secretary to the governing body of Advisor certifying that the authorization has not expired, been revoked or superseded; or

(c) An affidavit from an officer of Advisor's governing body certifying that the person executing this Contract on behalf of Advisor has the authority to do so and that the authorization has not expired, been revoked or superseded.

## XVI. Entire Agreement

This Contract, including all exhibits attached hereto and incorporated herein, embodies the entire agreement between the parties and no other prior agreement or understanding between the parties, their agents or employees, oral or otherwise except as otherwise provided herein, will constitute a part of the Contract, will be binding upon the parties, or will be effective to interpret, change, restrict, or otherwise modify the provisions of this Contract. In the event ERS exercises any legal, equitable or contractual remedies it may have in connection with Advisor's performance hereunder, the exercise of such remedy shall not be exclusive of any other remedy to which ERS is entitled.

## XVII. Severability

The parties hereby declare that if any portion of the Contract is determined by any court of competent jurisdiction to be unenforceable, the remaining provisions will stand as written and agreed to and will constitute independently enforceable provisions. Toward this end, the provisions of this Contract are specifically declared to be several, so that any one provision may be enforced without enforcement of any other. The waiver of any particular provision by either party shall not constitute a waiver of any other provision. No waiver shall be valid unless the same is reduced to writing and executed by both parties.

## XVIII.  Confidentiality

To the extent that the information provided by ERS to Advisor in connection with this Contract is confidential, Advisor shall maintain the confidentiality of all such information and materials provided to it by ERS by virtue of this Contract.

## XIX.  Disaster Recovery Plan

Advisor warrants and represents that it has a written disaster recovery plan in place that provides for the recovery of Advisor's electronic data and data processing equipment relevant to the provision of the services to be provided by Advisor under this Contract, and is designed to assure that such portions of the data processing system will be operational within ten (10) days of a natural disaster, or any other business interruption, whether natural or otherwise.

## XX.  Survival of Terms

The indemnity and confidentiality provisions of paragraphs IX and XVIII shall survive the termination of this Contract with or without cause.

## XXI.  Insurance

Advisor warrants and represents that the insurance coverages and amounts identified in the Proposal, including, but not limited to errors and omissions, fidelity and other coverages relevant to secure Advisor's performance of this Contract, are all in effect and enforceable as of the effective date of this Contract.  Advisor further warrants and represents that during the term of this Contract, and in connection with any amendment, renewal or extension of the Contract, Advisor shall maintain in force the coverages identified in the Proposal in amounts no less than the coverage limits stated therein.

## XXII.  Facsimile Signatures

Original signatures shall be affixed to this Contract.  However, ERS and Advisor agree that receipt of original signatures via facsimile and the attachment of multiple signature pages hereto are sufficient to constitute full execution of this Contract.

## XXIII.  Communications

All reports and other communications required hereunder to be in writing shall be delivered in person or sent by certified mail, return receipt requested, first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow:

|  |  |
|---|---|
| If to ERS: | Employees Retirement System of Texas |
|  | P.O. Box 13207 |
|  | Austin, Texas 78711-3207 |
| Attn: | Sheila W. Beckett |
|  | Executive Director |

cc:    Paula A. Jones
       General Counsel
       Via e-mail: pjones@ers.state.tx.us and
       Fax: (512) 867-7480

If to Advisor:    The Putnam Advisory Company, LLC
                  One Post Office Square
                  Boston, Massachusetts 02109
       Attn:      Peter Krug
                  Senior Vice President, Account Manager


## XXIV.  Effective Date

Upon execution by the parties, this Contract shall become effective on December 1, 2002.

IN WITNESS WHEREOF, the parties have executed this Contract.

ADVISOR: THE PUTNAM ADVISORY       EMPLOYEES RETIREMENT SYSTEM
         COMPANY, LLC               OF TEXAS.

*By: _Joseph A. Cassaro_           By: _Sheila W Beckett_

Printed Name: _Joseph A. Cassaro_   Printed Name:  Sheila W. Beckett

Title: _Managing Director_          Title:  Executive Director

Date: _12/16/02_                    Date: _12/9/02_
*Signature must be notarized

STATE OF _Massachusetts_  §
                          §
COUNTY OF _Suffolk_       §

This instrument was subscribed, sworn to, and acknowledged before me on

_12/16/02_____, 2002, by _Joseph A. Cassaro_, _Managing Director_, of
(Date)                    (Name of Officer)        (Title)

Putnam Advisory Company, LLC, a _Delaware_____, on behalf of
                                 (State of formation)

said limited liability company.

(stamp)                    _Cindy O'Donnell_
                           Notary Public Signature

CINDY O'DONNELL
Notary Public
Commonwealth of Massachusetts
My Commission Expires
January 19, 2007

International Equity Adviser Contract, FY 2003-2005
Page 9 of 10